GANNARD ET AL. *vs.* ESLAVA ET AL.

1. The objection cannot be raised for the first time in the Appellate Court, that the order of publication against non-resident defendants was not accompanied by an abstract of the bill, as required by the seventeenth rule of Chancery Practice.

2. Where a vendor conveys with covenant of warranty, and his vendee afterwards conveys portions of the land, with covenants of warranty, to two others, re_ taining a part himself, and the three are evicted of an undivided third part of the land by title paramount to that of the original vendor, they may join as complainants in a bill against him, to reimburse themselves for the loss sustained by the breach of his warranty.

3. Where a deed contains a general covenant of warranty, and there is, at the time of its execution, a paramount outstanding title, by which the vendee may be, or actually is afterwards evicted, he is a "creditor" of the covenantor, within the meaning of the statute of frauds, (Clay's Dig. 254 § 2,) from the execution of the deed.

4. In this State, a *voluntary* conveyance, though made *bona fide*, and in consideration of natural love and affection, is void as to the *existing creditors* of the grantor.

5. Where a husband purchases and holds bank stock in his own name, as trustee for his wife, although the advancement will be held a valid gift as against his personal representative, yet the husband may revoke it at any time during his life, and a court of equity will subject it to the payment of his debts.

6. The case of Baker et al. v. Heirs of Chastang, (18 Ala. 417,) touching the right of a married woman in this State to dispose of her real estate by will, and the effect of the probate of such a will, re-affirmed.

ERROR to the Chancery Court of Mobile.

Tried before the Hon. J. W. Lesesne.

This bill was filed by Miguel D. Eslava, Joseph Bogerean and James Johnston, against Victor Gannard, Susannah Gannard, his wife, Octavia Gannard and Tuskena Garnard, (their children,) and the Merchants' Insurance Company of Mobile. It alleges, that said Victor Gannard and wife sold a certain lot, situated in the city of Mobile, to complainant Eslava, by deed dated October 3, 1835, containing general covenants of warranty; that Eslava sold part of this lot to one Schuyler, by deed with warranty dated January 21, 1836; that said Schuyler, by his deed with warranty dated June 1, 1836, sold to Jumelot, and Jumelot to Bogerean in 1838; that said Jumelot and Bogerean, while in possession, made some valuable improvements, and leased to Baker and Primo; that Schuyler mortgaged to Eslava the lot which he had purchased of him; that Eslava foreclosed the mortgage, and sold the lot, and he and Johnston became the purchasers in April, 1839; that Johnston leased his lot to one Knellock; that an ejectment suit was brought against the tenants in possession, by the heirs of Chastang, who, at the Spring Term 1848 of the Mobile Circuit Court, recovered a verdict and judgment for an undivided third part of the lots of Johnston and Bogerean, and sixteen feet nine inches of the lot purchased at the Register's sale by Eslava, of all which the parties respectively were ousted by the sheriff; that by reason of the

premises, Gannard's covenant of warranty was broken, to their damage.

It is also alleged, that Gannard knew of this defect of title at the time of sale, and intended to defraud; and that for this reason, after converting his real estate and other property into money, he removed with his family to France; that before his sale to Eslava, Gannard owned, or afterwards purchased with his own money, fifty shares of stock in the Merchants' Insurance Company of Mobile, and, after the sale aforesaid, caused sixteen shares to be transferred to his daughter, Octavia, sixteen shares to his son, Tuskena, and eighteen shares to his wife, Susannah; and tha' since the transfer, Gannard had received the dividends on this stock as his own.

The bill prays, that the stock in the Merchants' Insurance Company may be sold, to reimburse to complainants their losses sustained by the recovery of Chastang's heirs against them, and that defendants may be enjoined for selling, or permitting a transfer of stock. Orders of publication were made against all those defendants who were shown to be non-residents, and guardians *ad litem* were appointed for Octavia and Tuskena Gannard, who were shown to be minors.

Gannard and wife in their answer admit that they executed the deed to Eslava, and deny all knowledge of the other conveyances. They insist that the action of ejectment should not be conclusive on Gannard, as to the breach of warranty, and that he has a good title, which is set out, and which he asks may be considered. The substance of this title is, that the land belonged to Madame Perouet, whom Gannard married, and thereby became tenant for life; that his wife made a will, and devised the land to him, and also a deed under which he went into possession, and so remained until he sold to Eslava.

The answers also state, that before the sale to Eslava, Gannard owned forty-three shares of stock in the Bank of Mobile, in his own name, purchased May 15, 1834; six shares in the name of his wife, purchased August 20, 1832, and nine shares, purchased May 15, 1834; and six shares in the name of each one of his children, purchased May 15, 1834; that in May 1836, all this stock in the Bank of Mobile was sold; that the shares of his wife and children, which sold

at a premium, brought $3375, and this he invested on the same day in stock of the Merchants' Insurance Company of Mobile; that the investment in the Bank of Mobile stock was made previous to the sale to Eslava, as an advancement to his wife and children, at a time when his pecuniary situation gave him a good right to make such an advancement. They also ask, that the rights of ther infant children, who reside with them, may be protected. This abstract of the facts will be sufficient for a proper understanding of the opinion.

At the hearing, the Chancellor decreed that the fifty shares of stock, which stood in the name of Mrs. Gannard, Octavia Gannard and Tuskena Gannard, on the books of the Merchants' Insurance Company of Mobile, should be condemned to the satisfaction of complainants' demands.

The errors assigned are: first, in rendering a decree when all the parties defendants were not in court; secondly, in not dismissing the bill for misjoinder of parties; thirdly, in rendering a decree in favor of complainants on the proof.

P. HAMILTON, for plaintiffs in error:

1. This is a bill of injunction against non-resident defendants, two of whom are infants. The rule of practice requires the publication should contain an abstract of the allegations of the bill. Clay's Dig. 614, Rule 17; see Pub. Rec. pp. 13, 14. No guard. *ad lit.* was appointed for infant Tuskena. The order of publication states she is an infant. 3 Porter's Rep. 10. No answer was filed for infant Tuskena, nor has she been brought properly before the court, and in the mode of service the direction of Rule 41, Clay's Dig. and Rule 4, 2 Ala. Rep. were not complied with. 16 Ala. Rep. 509.

2. The decree is believed to be erroneous on the testimony. The stock properly belongs to the wife and children. It is an advancement made by the husband and father. 2 Story's Eq. §§ 1203-4; 14 Ala. Rep. 788 and author's. 2 Beavan Rep. 447; 1 Young & Col. Rep. 65. The possession of the title papers and receiving the dividends by the father, does not rebut the presumption of advancement. 1 Young & Col. Rep. 65; 14 Ala. Rep. 792-3-4. This is true of both the investments. The Bank of Mobile stock was procured before

the deed to Eslava; before any claim or contract had been made with Eslava. If the stock in the Bank had remained, no question would have arisen; for the investment was made before the deed to Eslava, and Gannard was amply able to make the investment.

It is contended, the Insurance Company stock is a substitute for the Bank stock, and entitled to the like protection. It was undoubtedly so intended. Gannard regarded himself as re-investing for the benefit of his family, in better securities, the proceeds of the Bank of Mobile stock. Equity looks to the subject of a transaction, rather than its form. 1 Story Eq. 179. The receipt of the proceeds of the Bank stock by Gannard, forms a valuable consideration for the present investment. It should be protected. 8 Cowen's Rep. 436.

3. The complainants have no right to subject this stock. *They were not creditors.* If the present investment is a continuation of that in Bank of Mobile, they clearly have no such claim; that was made in 1834; the deed to Eslava in 1835. If confined to investment in Insurance stock, in 1836, they were not creditors. The covenant of warranty was made in October 1835; the eviction by title paramount occurred in 1848, thirteen years afterwards.

No cause of action accrued till twelve years after the transfer of this stock; till then no debt was created, no debt existed. Eslava was not a creditor of Gannard. A voluntary deed of this kind is good, except against creditors and purchasers. Clay's Dig. 254 § 2; so held in 8 Porter's Rep. 351. As to who are creditors, 1 John. Cases 73; 9 John. Rep. 127; 15 ib. 261; Douglass' Rep. 92; 1 Conn. Rep. 299–300–304, *et seq.* opinion Hosmer, J.; 8 Term. Rep. 521; 3 ib. 539; 3 Atkins' Rep. 410–412. The English statute, 13 Eliz. uses the terms "creditors and others." Atherley on Marriage Settlements, 224–5; 1 Am. Leading Cases, 57. The same words are found in the New York and Maine statutes. Not so in the Alabama statute; the term "creditors" only is used. As to the effect of the words "and others," *vide* 2 Atkins' Rep. 601; Atherley on Mar. Set. 224–5, and Law Lib. 117; 5 Cowen's Rep. 67, Sutherland, J., which is the foundation of all the decisions in New York. For what is decided in 4

Greenl. Rep. *vide* end of the opinion, p. 2078, where positive fraud was found by the verdict.

The English Acts of Bankruptcy use the word "creditors." Chitty's Black. Com. Book II, p. 480, and note, edition 1832. What is meant by "creditors" in that act, and what debts, may be proven, *vide* auth. Sup.; 2 Comyn's Dig. Tit. Bankrupt. D. 3, and notes; Bacon's Abgt. Tit. Bankrupt. E. The Tennessee statute is the same as the Alabama statute, and upon it see 9 Humph. Rep. 519–521; 5 Humph. 26–34; ib. 66–67; 15 John. Rep. 571–588; and see 2 Lomax Dig. 366–367 on Va. statute. This court has repeatedly given a meaning to the term "creditors," as found in the Alabama statutes. Clay's Dig. 256 § 5; *vide* 8 Ala. Rep. 866; 9 Ala. Rep. 436; 12 Ala. Rep. 309; ib. 367; 17 Ala. Rep. 503, top of page; Clay's Dig. 502 § 2; Jones v. Burden, at present term; Clay's Dig. 194 § 10. What is meant by "claim," 12 Ala. 551, head note 4.

4. By the terms of the statute, (Clay's Dig. 255 § 3) this property is secured to the wife and children; for at any event there is a good consideration, if not one deemed valuable. The natural love and affection of the defendant for his family, and his obligation to maintain them, is a good consideration, and should be supported in the absence of fraud.

5. The bill should have been dismissed for a misjoinder of parties. The answer contains a demurrer. Even if Eslava was a prior creditor, Johnston and Bogerean were not; their title was acquired long after the investment in Insurance stock. *Vide* bill. The right of all the complainants must be established, or the bill will fail.

6. There is no proof of fraud in making this transfer to the wife and children; and fraud will not be presumed, to defeat the rights of married women and children, who are always carefully protected in equity. The proof is ample, as to the ability of Dr. Gannard to make this investment in favor of his wife and children.

7. It is denied that the covenant of warranty is broken. Gannard was no party to, or notified of the action by parties claiming to be heirs of Chastang. The record in the case of Baker et al. v. Heirs of Chastang, (reported 18 Ala. 417) shows the title of Gannard, and is to be regarded as part of

this case. That title rests on the will of Mad. Gannard, de-
vising this lot, among others, to her husband, Dr. V. Gannard,
which was duly admitted to probate by the Orphans' Court
of Mobile county. The court is respectfully requested to
reconsider the ruling of the court made in that case, by two
out of the three Judges: 1. on the power of a married wo-
man to make a will of real estate in Alabama; 2. upon the
effect of the judgment of the Orphans' Court, thus offered
collaterally as evidence in another case.

It is submitted that, by the Alabama statute, a married
woman may make a will. Stat. of Wills, Clay's Dig. p. 597.
The same word " seized " is used in the statute of descents.
Clay's Dig. 168. There was no tenancy by the courtesy in this
case. 5 Ham. Rep. 65 ; Reeves Dom. Rel. 137–154, and see
17 Vermont Rep. 323. By the English statute, married
women are in terms excepted ; not so in the Alabama stat-
ute. 1 Jarman on Wills, 27, et seq.; 2 Kent's Com. 170;
Reeves Dom. Rel. 137 et seq.; 17 Vermont Rep. 328. By
the statute of this State, all wills, whether of real or personal
estate, must be probated by the Orphans' Court of the county.
16 Ala. Rep. 590–1; 2 Ala. Rep. 235. The judgment of
that court becomes binding as the judgment of a competent
court, over subject within its jurisdiction, and cannot be col-
laterally impeached. 5 Mason Rep. 334 ; 4 Mason Rep. 461;
8 New Hampshire, 124; 3 Story Rep. 13; 1 Story Rep. 318;
3 Day Rep. 318. While the same court, in a preceding
volume, 2 Day. 163, had on a direct appeal decided, a married
woman could not make a will. The decisions of this State
have been of the strictest character, in maintaining that
voluntary conveyances are void against existing creditors.
But to affirm the doctrine of this case, would go a bow shot
beyond any thing decided, and effectually forbid a parent
setting apart any of his property for the benefit of a wife or
child, if there existed the possibility of a demand thereafter
arising against him.

JOHN A. CAMPBELL, contra:

1. The creditor, within the meaning of the statute of
frauds, § 2, 254 Clay's Digest, is one who has or may have a
claim or demand against the debtor, upon a contract in exist-

ence at the date of the voluntary conveyance, and embraces the covenantee in a covenant of general warranty, who is evicted by a title outstanding and paramount at the date of the contract. Roberts on Frauds, 457, 450; 10 Vesey, 360; 18 Wendell, 375; 4 Greenleaf, 195; 8 N. Hamp. 48; 1 Robinson Va. R. 123; Jackson v. Seward, 5 Cowen R. 67; 8 ib. 428; 11 Illinois Rep. 300; 18 John. 425; 1 Conn. 275; 4 Eng. Con. Ch. R. 262; 18 Ala. R. 586.

2. The conveyance of Gannard to his wife does not place the property beyond the reach of his creditors. It is now the property of Gannard, and liable for the payment of his debts. 2 Story's Rep. 316; Clancy on Rights, 90, 98; 5 Metcalf, 280, 320; 17 Maine R. 301.

3. The conveyance to the children is fraudulent, as against an existing creditor. 18 Ala. Rep. 586, 596, and cases cited.

4. There is no statement in the bill of a misjoinder of parties, nor of multifariousness. The question cannot be raised here. 15 Ala. Rep. 472; 10 ib. 310.

5. The parties complaining are jointly liable on the covenant of warranty, and in the costs of the ejectment suit. The suit is properly brought under the decisions in favor of creditors. 16 Ala. Rep. 233; 4 Howard S. C. 127; 10 Ala. Rep. 432.

6. In the matter of the service of process: the rules 40 and 41 afford the source from which the process in this case was made. The order of publication was transmitted to the parents and the children; so that each had notice. All services, to affect children, must be made on the parents.

7. The act of 1845 was made for the benefit of *the defendant debtors*. The publication was designed for their benefit. In this case the father and mother, to whom the publication should have been transmitted under the rule, have in this case appeared to the cause, and have fully answered the same. The bill itself has been shown to them, and they have answered it on knowledge. 9 Ala. Rep. 180; 5 Ala. Rep. 158.

8. Had there been a publication, it would have been sent to the *parents* of the children under the rule. The record shows a service of a copy of the bill upon them. In *the answer of Gannard and wife, they represent that the defendants,*

*Octavia and Tuskena are minors, and pray that their interests may be protected by the court.* Here is what the rule in reference to infants was designed to secure for them.

9. The court was bound to appoint a guardian *ad litem* in this case. Gannard and wife decline, and repose this duty upon the court. The infants were then legally represented before the court.

10. *The point cannot* be taken in this court, that the publication was not full. 7 Ala. Rep. 823; 12 ib. 265.

11. The bill is filed upon the equity of the act of 1846, but not upon the act itself. 16 Ala. Rep. 234.

PHELAN, J.—It is objected to the decree in this case, that Octavia Gannard and Tuskena Gannard, who were non-resident minors, were not properly before the court; and the ground relied upon to sustain the objection is, that it does not appear, that in the publication which was made, there was any abstract of the contents of the bill, pursuant to Rule 17, Clay's Dig. 614, and the statute of 1845, Acts, p. 18.

The *insufficiency* of the brief of the bill, which the rule requires to accompany the order of publication, or even its *entire omission*, cannot be urged for the first time in this court. McGowan v. Branch Bank of Mobile, 7 Ala. Rep. 823; Cowart v. Harrod, 12 Ala. 265.

They answered by *guardians ad litem* regularly appointed, and it sufficiently appears that their interests were protected.

The objection, that there is a misjoinder of complainants, we consider untenable. All three of the complainants held separate portions of the land sold by Gannard originally to Eslava, with warranty, and by him resold to the other two with warranty. If Eslava was a creditor, by reason of the covenant of warranty in Gannard's deed, so, likewise, were the other two, who purchased with covenant of warranty from Eslava, and were, with him, ousted by title paramount to that of Gannard. They all had the right to look to Gannard for indemnity, by suit on his covenant, and any cause which would authorize one to go into a court of equity as a creditor, would equally permit him to join the others, or the others to join him. This is for the benefit of Gannard, and all concerned, to avoid multiplicity of suits, one of the beneficent

objects of chancery jurisdiction. Although the complainants are many, the relief sought is, as far as respects the defendants, one in character. Brown v. Bates, 10 Ala. Rep. 432; Story Eq. Pl. § 99, et seq.

Where all the creditors have a common interest, as here, in all the objects of the bill, they may sue jointly. Story Eq. Pl. § 104.

This brings us to the two main questions in the case:

1. Does the covenant of warranty, in the deed of Gannard to Eslava of 3d October, 1835, make him a debtor as of that date to Eslava, and to purchasers with warranty from Eslava, who have been ousted by title paramount to that of Gannard?

2. Will a voluntary conveyance be treated as void under the statute of frauds against an existing creditor, even in the absence of actual fraud?

Upon the first of these points, we think it clear, both from reason and on authority, that the covenantee in a deed for land, containing a general covenant of warranty, is a "*creditor*" of the covenantor from the making of the deed, within the meaning of the statute of frauds, (Clay's Dig. 254, § 2,) in all cases where there is a paramount outstanding title, by which he may be or actually is afterwards evicted. The debt created by such a deed from the warrantor to the warrantee, differs in no essential particular from the debt created by a bond with condition. In both cases it is "*debitum in præsenti, solvendum in futuro*" upon a contingency. The deed is in substance but a bond for the purchase money, with the condition that the penalty of the bond shall be paid if the grantee be evicted, or that the grantor shall refund to the grantee whatever sum it may become necessary for him to pay out, in the purchase of a paramount outstanding title, to save himself from such eviction. Under the second section of the statute of frauds, any one is a creditor, who has a right by law to demand, either presently, or upon some future contingency, the fulfillment of any obligation or contract. To give the statute a less extensive meaning, would be to destroy its chief excellence.

Roberts on Frauds 459, says; "It cannot be said, that an obligor in a bond, before the pecuniary demand arises by the

forfeiture, can be ignorant of his liability or danger, so as to exempt him from the imputation of fraudulent intent upon this statute of Elizabeth. And, indeed, if the construction of this statute can properly be influenced by technical reasoning, it may be remarked, that there is a present debt existing at law immediately upon the execution of the bond, the condition being a condition subsequent only, and operating merely upon the remedy, without in any manner changing, diminishing, or qualifying the debt itself."

Sutherland, J., in Jackson v. Seward, 5 Cowen, 71, says: "The question of creditor or not cannot turn on the ground of *contingent* liability, when considering this act, (statute of frauds). If it should, all endorsers and sureties would be deprived of its protection."

It is argued, that the English statute and the New York statute contain the words, "creditors and *others,*" and that our statute contains the word *creditors* only : and that therefore the English and New York cases upon this point rest on a broader basis than our statute. In cases where the effort was to set aside voluntary conveyances, as fraudulent, when they were made pending actions for *torts* against the makers, and before judgment recovered, and in some other cases, some stress seems to have been laid on the words, "*and others.*" Jackson v. Myers, 18 John. 427; Lewkner v. Freeman, Prec. in Ch. 105; 3 Coke, 82; Taylor v. Jones, 2 Atkins, 600.

In commenting on the case in 2 Atkins, Taylor v. Jones, Mr. Lomax, in his Digest, Vol. 2, 341, uses this language: "The omission of these words, "*and others,*" in the act of assembly of Virginia, has not, however, according to the generally received impressions of the legal profession, varied the construction of the statute in this particular. We have in our act retained that expression of the statute of Elizabeth which is equally comprehensive: "the person or persons, &c., whose debts, suits, demands, &c., shall be disturbed," &c. The same remark will apply to the statute of Alabama, which is an exact copy of the Virginia statute. Besides, it will be found, that both the English and New York cases expressly decide, that a person whose debt was at first *contingent*, is not the less a *creditor*, according to the statute, on that account; the word *others* is not invoked in aid of such. Roberts on F. 459; 5

Cowen, 71; East India Co. v. Clavel, Prec. in Ch. 377; 10 Vesey, 360; 4 Greenleaf, 195.

Many authorities are cited by the counsel for the plaintiffs in error, to show that the word *creditors*, as contained in our registration acts, (Clay's Dig. 256, § 5; ib. 502, § 2), and our act "*to prevent the sacrifice of real estate*," (Clay's Dig. 194, § 10), is construed to mean *judgment creditors;* and that the same word, as used in the bankrupt acts of England, is held not to extend to creditors whose debts are *contingent*. This is all true; but the same reasoning which would uphold such a construction of the word in these statutes, would forbid it when we come to consider the great object of the statute of frauds, namely, the prevention of every sort of dishonest contrivance to defraud any and every kind of honest creditor. Although ordinarily none other than *judgment creditors* can proceed in equity, to set aside a conveyance void for fraud, yet the idea has never received countenance from any quarter, that a person must be a judgment creditor, before a deed can be concocted against him that shall be fraudulent and void as to his debt.

We take it, therefore, to be sound law, that a covenantee in a deed with general warranty, is a *creditor*, within the meaning of the statute of frauds, at the date of the deed, whenever there is then existing an outstanding paramount title to that of his covenantor; in other words, that a liability, though *contingent*, is an *existing debt*, in view of the statute of frauds.

This brings us to the question, whether a voluntary conveyance is good, in any case, against an existing creditor; or, can a man who owes a debt make a transfer of his property to his wife and children, from natural love and affection, which shall make such property no longer liable for that debt?

The doctrine was laid down explicitly for a long time, by a number of very eminent English judges and chancellors, that such a thing could not be done.

Lord Hardwicke, in Townsend v. Windham, 2 Vesey, 10, uses this language; "I know no case on the 13th Eliz. where *a man, indebted at the time*, makes a voluntary conveyance to a child, and dies indebted, but that it shall be considered a

part of his estate, for the benefit of his creditors." Roberts on F. 24.

Mr. Roberts, in his admirable treatise on the statutes of frauds, observes; "It is worthy of remark, that the whole strain of Lord Coke's reasoning in the last mentioned case, (Twyne's case, the great leading case on this subject), shows it to be his opinion, that the statute 13 Eliz. should be so construed, as to make it substantially operative to the benefit and protection of *bona fide creditors;* insomuch that a motive abstractly good and moral shall, by the presumption arising upon this statute, be *intended* fraudulent, whenever the grantor stands *indebted at the time,* against his *bona fide* creditors." Roberts on F. 449.

The plain and simple rule then prevailed, that, as to *existing* creditors, every mere voluntary conveyance was void, without respect to the motive with which it was made; and that as to *subsequent* creditors, it would be held void, or not, according to the actual intent with which it was made, to be gathered from all the surrounding circumstances.

This rule became relaxed in England, so far as to leave the *actual intent* to govern, as to the validity of voluntary conveyances, *in all cases,* and thus have been introduced many nice distinctions and perplexing inquiries. The same relaxation of the old rule has been followed by many of the courts of this country, and, among others, by the Supreme Court of the United States, and is countenanced by eminent law writers. This whole subject, and the authorities which relate to it, have been lately examined with care by my brother Chilton, in the case of Foote & Wife v. Cobb, 18 Ala. Rep. 585; and I refer to his opinion, as an able vindication of the correctness of the rule. That opinion, and the opinion of Chief Justice Saffold, in the case of Miller v. Thompson, 3 Porter, 196, in which the law was first settled this way in this state, will be found together to contain a full exposition of the authorities on this subject, and to them I refer.

One only suggestion of my own. Those who discard the old rule, urge strongly the claims of wives and children for whom provision has been made in good faith, against those creditors who have allowed their debts to become old and stale. Against such generally, it may be remarked, the sta-

tute of limitations is, and was intended to be, an ample protection for wives and children and every one else. But what will those who are influenced by their sympathy for wives and children, do with cases like the present, where the liability of the settlor is a contingent liability, and the debt of the creditor is a contingent debt, dependent upon the condition of a bond or the covenant in a deed. The debtor may be beggared by a forfeited bond or a broken covenant, years and years after its execution, without a shadow of blame on his part, and shall he remain so, while the wife and children of his covenantor live, perhaps, in ease and affluence, upon the mere bounty of the man who has all along been bound in law and conscience to make good his losses?

It only remains to apply these principles to the facts of the case.

We are quite pursuaded, by the testimony in the cause, that Dr. Gannard, at the time he transferred the fifty shares of stock in the Merchants' Insurance Company of Mobile, to his wife and children, did not intend to commit a fraud upon his creditors. We have no question but that he was governed by correct motives in what he did. He was then a man of ample fortune; the witnesses say, he was worth a hundred thousand dollars, or thereabouts, and free from debt, and nothing was more reasonable and proper than that he should make a provision and advancement not more extensive than this for his wife and children. There is some proof that he left Mobile clandestinely, after making sale of all his property, and that he did so to avoid suits that were threatened by his first wife's relations. This proof we think is satisfactorily repelled. We find no actual fraud, in the transfer of stock to his wife and children.

There is proof, that previous to the deed to Eslava, Dr. Gannard held in the Bank of Mobile seventy shares of stock; of this, six shares were in the name of his wife, Susanna Gannard, nine in his name as trustee for his wife, and twelve shares he held as trustee for his children, Octavia Gannard and Tuskena Gannard, six for each. On the 7th May, 1836, a little over seven months after the date of his deed to Eslava, Dr. Gannard sold at public auction these seventy shares of stock in the Bank of Mobile, at one hundred and twenty-five

47

dollars the share, and on the *same day*, 7th May 1836, he transferred fifty shares of stock which he had held since 1834, in the Merchants' Insurance Company of Mobile, to his wife and children, thus: sixteen shares to his daughter Octavia; sixteen to his son Tuskena, and eighteen to his wife, Susanna Gannard. The dividends on this stock from 1836 to 1850, were drawn by Guesnard and Lopez, as the attorneys of the holders.

The proof is, that at the time of this transfer, the stock of the Merchants' Insurance Company was ranging from ninety dollars to par.

So far as respects the stock held in the name of Mrs. Gannard, we are all of opinion, that although a gift from her husband to her separate use, which would hold good as against his representatives, it is nevertheless one which he may resume at any time during his life, and which will consequently be held subject to the claims of creditors. 5 Metcalf, 280; 2 Story's Rep. 316.

As respects the stock transferred to the children, in the Merchants' Insurance Company of Mobile, my own mind is convinced from the proof, that this was, to the extent of the funds realized from the sale of the stock of the children in the Bank of Mobile, only a re-investment for their benefit, and should be so held. That it was not an original gift from their father, as of that date, and therefore subject to the claim of Eslava as pre-existing; but that it was a purchase with their money, which it will be their right hereafter to pursue and recover, if it is taken from them in this proceeding, unless they elect to proceed against the Bank of Mobile for the original stock in that bank. My brethren differ from me on the force of the proof to this point, and holding the transfer of Merchants' Insurance Company stock to be a gift as of that date, and not an investment of the money of the children, agree in condeming this stock likewise to the satisfaction of the claims of creditors.

It only remains to add, that the decree of the court below is affirmed.

We have been requested by the counsel for plaintiffs in error, to reconsider the decision of this court in the case of Baker et al. v. The Heirs of Chastang, 18 Ala. 417, on two points:

1. That a married woman cannot, by virtue of the statute of this State, (Clay's Dig. 596, § 1,) make a valid will of real estate;

2. That the admitting of such a will to probate, by the Orphans' Court, is not conclusive of the right of a married woman to devise her real estate, and that the heir, notwithstanding the probate of the will, may deny its efficacy as a muniment of title, as against his title by descent.

The contrary propositions were relied on in that action to make good the deed of Gannard to Eslava, as against the heirs of the first Mrs. Gannard, who was a Chastang, and who devised to her husband the real estate in controversy in that suit, and whose will was probated by the Orphans' Court of Mobile.

Agreeably to the request of the counsel, we have carefully reconsidered the decision in that case, on the points in question, and are fully satisfied with that decision, and deem it needless to do more than refer to the reasoning and authorities of the opinion in that case, as conclusive of the same points presented by the answer of the defendants in this case.